## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID MASTRIANNI | : | CIVIL ACTION NO: |
| Plaintiff, | : | 3: 02 CV 2261 (CFD) |
| | : | |
| | : | |
| BAYER CORPORATION and BAYER | : | |
| CORPORATION DISABILITY PLANS | : | April 7, 2005 |
| Defendants. | : | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

Plaintiff (hereinafter, "Mastrianni") hereby opposes defendants' Motion for Summary Judgment, and submits this memorandum of law in support of his opposition to the motion. Mastrianni has also filed a Local Rule 56(a)(2) statement.

### II.     FACTS

Mastrianni worked for Bayer Corporation as employee trainer, training employees on the factory floor and working at a computer. Mastrianni's Affidavit, ¶1, attached hereto as Exhibit A ("Mastrianni's Affidavit"). As an employee of Bayer, Mastrianni was a participant in the Bayer Corporation Disability Plans (the "Plans"). In 1995, he was diagnosed with Hodgkin's Lymphoma, and underwent chemotherapy and radiation treatments. Mastrianni's Affidavit ¶ 2. As the same time, he developed back trouble, which he believes was caused by or contributed to by his cancer treatments, though no medical

ORAL ARGUMENT REQUESTED

connection has been established. Mastrianni's Affidavit, ¶3. His back condition grew

worse, and increasingly interfered with his ability to perform his job.   Mastrianni's

Affidavit, ¶4. As a result of his back condition, he started working part-time in August

2001. Mastrianni's Affidavit ¶ 4. He was approved for short-term disability payments to

make up the difference between his part-time earnings and his full-time pay. Mastrianni's

Affidavit, ¶ 4; Defendants' Exhibit 3. In March 2002, Mastrianni accepted his doctor's

advice that he was no longer able to perform his job on any basis. Mastrianni's Affidavit ¶¶

6, 7. He was approved for total disability for the day March 18, 2002. Mastrianni's

Affidavit, ¶ 8. On March 19, 2002, he came into work, intending to tell the Company that

he was totally disabled, and the 19th would be his last day of work before leaving on a full-

time disability leave.   Mastrianni's Affidavit, ¶ 9. He had discussed this decision with

Bayer's human resources representatives prior to this date. Mastrianni's Deposition at 16.

He was informed that day that he was being laid off in a reduction in force. Defendants'

Local Rule 56(a)(1) Statement of Undisputed Facts ("Defendants' Statement") ¶ 11.  After

the lay off, Bayer gave Mastrianni a release to sign in return for severance benefits.  Id.

Mastrianni's counsel attempted to negotiate the terms of the release to except any claim for

disability benefits from the operation of the release. Defendants' Statement, ¶¶18, 19, 21.

Defendants declined to do so. Defendants' Statement, ¶20. Mastrianni's counsel stated his

belief that the release did not apply to Mastrianni's claim for disability benefits, since his

right to the benefits had vested. Defendants' Exhibit 7, page 2; Mastrianni's Statement,

Disputed Issue No. 4. Bayer refused to make the change, and nor did it amend the release to explicitly apply to the disability benefits Mastrianni had been receiving. Also, none of the correspondence from Bayer stated that the release in fact applied to the disability benefits. See, Defendants' Exhibit 8 and 10. On or about June 3, 2002, Mastrianni signed the separation agreement attached as Defendants' Exhibit 5 (the "Separation Agreement").

On October 1, 2002, Mastrianni submitted a claim for disability benefits, Defendants' Statement, ¶ 27, which was denied.

III.    ARGUMENT

Defendants claim that Mastrianni released his right to vested long-term disability benefits when he signed the Separation Agreement. Mastrianni did not release his right to continue to receive disability benefits because the release did not explicitly provide that he was waiving his vested right to continue receiving these benefits. The failure to specify this voids the release on two grounds: a release of vested ERISA rights is only effective if the vested benefits are specifically mentioned; and it was not knowing and voluntary because the release lacked clarity regarding its effect on disability benefits.

In deciding both these issues the Court must consider general principles applicable to this case. As conceded by defendants, releases of ERISA benefits are subject to close scrutiny. Sharkey v. Ultramar Energy Limited, 70 F.3d 226, 231 (2$^d$ Cir. 1995). Further, the Second Circuit construes ambiguities in ERISA documents against the drafter, so any

ambiguity in the release should be resolved in Mastrianni's favor.  Masella v. Blue Cross & Blue Shield, 936 F.2d 98, 107 (2d Cir. 1991) (when applying de novo standard of review, ambiguities in plan documents are construed against the plan).

A.    Standard of Review

In deciding a motion for summary judgment, the court "is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." Cronin v. Aetna Life Insurance Company, 46 F.3d 196, 202 ( 1995). The moving party must demonstrate the absence of any material fact genuinely in dispute. King v. The New York Telephone Company, Inc., 785 F.2d 31, 35 (2d Cir. 1986).

B.    Mastrianni Did Not Waive his Right to Disability Benefits Because the Benefits Had Vested Prior to Execution of the Separation Agreement

1.    Mastrianni's Benefits Vested No Later than the Last Day of His Employment.

Mastrianni's disability benefits vested prior to his termination, so his termination did not affect the vesting of his benefits.

"Vesting" is simply the term ERISA cases use to refer to the question of whether a participant has earned a contractual right to benefits under an ERISA plan.  Feifer v. Prudential Insurance Company of America, 306 F.3d 1202, 1210 (2nd Cir. 2002) ("a claim under § 1132(a)(1)(b), 'in essence, is the assertion of a contractual right,'" quoting. Strom v. Goldman Sachs & Co., 202 F.3d 138, 142 (2nd Cir. 1999.)) If a Court determines that a participant has contractually earned the benefit, the benefit becomes vested under ERISA,

and is subject to all the protections ERISA establishes for vested benefits. *See*, Feifer, 306 F.3d at 1211.

Mastrianni's right to disability benefits vested under the terms of the plan document. The short-term disability summary plan description provides that a participant is entitled to disability benefits for "absence from work due to disability." Defendants' Exhibit C at 2. The long-term disability plan provides for benefits once the employee has been disabled for more than twenty-six weeks. Defendants' Exhibit C at 7. Both plans provide that an employee is a participant in the plan so long as the employee is "actively employed by an Employer at the time the disability occurs." Mastrianni's disability arose prior to the last day of his employment, considering that he was certified as disabled from December 14, 2001 through October 18, 2002. Defendants' Exhibit 4. Since his employment did not terminate until the following day, Mastrianni was actively employed at the time he became disabled. Mastrianni has therefore shown that he was a participant in the plan, and that while he was a participant, he was disabled. He is therefore vested in the plan.

Even if the Court decides that the plans are silent on the issue of the effect of termination of employment on benefits that an employee was then receiving, Mastrianni is still entitled to benefits. The Second Circuit addressed the issue of when disability benefits vest in the case of Feifer v. Prudential Insurance Company of America, 306 F.3d 1202 (2nd Cir. 2002). The plaintiffs in the case were receiving disability benefits when the plan distributed new plan documents providing that disability benefits were offset against any

social security disability benefits received by the plaintiffs. The plan documents did not contain any explicit language that either promised vested benefits, or reserved the right to revoke benefits. <u>Feifer</u>, 306 F.3d at 1211. The Court held that if a plan was silent on this issue, the participants' benefits vested **when they became disabled**:

> We conclude as a matter of law that, absent explicit language to the contrary, a plan document providing for disability benefits promises that these benefits vest with respect to an employee no later than the time that the employee becomes disabled.

<u>Id.</u>

The court therefore held that the employer could not change the terms of the plan once the participants had become disabled.

Defendants claim the fact that Mastrianni's employment was terminated on March 19 meant that any right he had to receive disability benefits ended on that day. Mastrianni's right to receive benefits, however, had already vested as of the day. Mastrianni became totally disabled prior to the termination of his employment. Prior to termination of his employment, he was a participant in the disability plans under the plan terms. Therefore, under the terms of the plan and the rule of the <u>Feifer</u> case, his right to disability benefits vested prior to termination of his employment. As a vested benefit, termination of Mastrianni's employment did not affect his right to continue receiving his vested benefit.

This case is similar to <u>Lauder v. First UNUM Life Insurance Company</u>, 284 F.3d 375, 379 (2nd Cir. 2002), where the court stated that a participant who had a disabling accident on her last day of work was eligible for long-term disability benefits, even though the accident occurred after work hours.  In the instant case, no provision of the plan documents provides that vested benefits cease when employment ceases.  As established by <u>Feifer</u>, in the absence of such language, the benefits are vested.

### 2.  The Release is Not a Valid Waiver of Vested Benefits.

To be effective, any release or waiver must specify the benefits affected thereby.  <u>Lyman Lumber Co. v. Hill</u>, 877 F.2d 692, 694 (8th Cir. 1989) (statement in divorce decree that gave husband his entire interest in the plan, free of any interest of the wife, did not divest the wife of her beneficiary interest in the policy, since beneficiary interest not specifically addressed).  Nothing in the release at issue in this case specifically refers to disability benefits or that Mastrianni is waiving his vested right to receive the benefits.  The release paragraph in the separation agreement simply states that the release applies to the company's benefit plans.  Defendants' Exhibit, ¶ 5.  Since the release does not specifically state that Mastrianni is waiving his right to continue receiving disability benefits, the Court should not hold that Mastrianni waived his right to receive these benefits as a matter of law.

None of the cases defendants cite for the proposition that Mastrianni waived his right to disability benefits involve a release of vested benefits that the participant was receiving at the time the release was executed.  In the case of Laniok, 935 F.2d at 1364, the plaintiff waived the right to **participate** in a plan, rather than waiving the right to received already-vested benefits.  In Sharkey v. Ultramar Energy Limited, 70 F.3d 226, 231 (2nd Cir. 1995), the Court remanded the issue of whether the release at issue was effective to waive the employee's right to receive pension benefits, and never addressed the issue of whether the benefits claimed were vested, or what effect the vesting would have on the ability of the participant to waive the benefits.  In the unreported case of Yablon v. Stroock & Stroock & Lavan Retirement Plan & Trust, 2000 U.S. Dist. LEXIS 10528 (S.D.N.Y. June 11, 2002), only one count (the first count) arguably concerned a claim for vested benefits, and that claim was dismissed on statute of limitations grounds.  Id. at *24.  The two other cases cited by defendants, Lambertson v. Kerry Ingredients, Inc., 50 F. Supp. 2d 163 (E.D.N.Y. 1999) and Gonzalez v. IBM, 1997 U.S. Dist. LEXIS 21716 (E.D.N.Y. Feb. 3, 1997) did not involve ERISA at all, and so provide little support that a non-specific release can deprive a participant of vested ERISA benefits.

Releases of ERISA rights must be explicit and specific; if the benefit is not specifically addressed in the release, the release should not affect the participant's right to receive the benefit.  The release at issue in this case does not specify that it

applies to Mastrianni's right to continue receiving disability benefits, and so the release does not affect Mastrianni's vested right to the benefits. Defendants' motion should therefore be denied.

C.    Mastrianni's Execution of the Separation Agreement was not knowing and voluntary.

Defendants admit that the Separation Agreement only operates a release of Mastrianni's right to receive disability benefits if Mastrianni knowingly and voluntarily executed the agreement. The Laniok case established a four-part test to determine whether a release of ERISA rights is knowing and voluntary:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney [as well as whether an employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so] and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

Laniok, 935 F.2d at 1368 (quoting Bormann v. AT&T Communications, Inc., 875 F.2d 399, 403 (2d Cir. 1989).

Clarity in what the participant is releasing is explicitly required by the fourth prong of the Laniok test  Laniok 935 F.2d at 1368.   Nothing in the release at issue in this case specifically states that Mastrianni is waiving his vested right to receive the benefits. The release paragraph in the separation agreement simply states that the release applies to the company's benefit plans. Defendants' Exhibit, ¶ 5.

Defendants were aware that Mastrianni was not clear regarding the effect of the Separation Agreement on his right to keep receiving disability benefits. Mastrianni's counsel stated to defendants that Mastrianni was unclear whether the Separation Agreement would bar his claim for disability benefits. Defendants' Exhibit 7. None of defendants' replies clarified this point, only stating that defendants believed that the Release would bar the benefits. See Defendants' Exhibit 8. All defendants did was state that they would not amend the release, without stating whether or not the Release would operate to wipe out Mastrianni's right to continue receiving his vested benefits. Defendants did not change the release to clarify this issue, either.

Mastrianni clearly did not believe that he was giving up his right to continue receiving disability benefits. Mastrianni's Deposition at 40, 42 – 43, 44 & 45, attached to Mastrianni's Rule 56(a)(2) statement. He understood that he was giving up certain rights, such as the right to sue for wrongful discharge. Mastrianni's Deposition at 28 – 29. He was clear that he did not intend to give up his right to receive disability benefits. The lack of clarity in the Separation Agreement, that is, its failure to specify that he was giving up the right to continue receiving benefits, and Bayer's refusal to even clarify this point, directly led Mastrianni to sign the release. If defendants had fulfilled their duty to clearly state what benefits it believed

were being released by the Agreement, Mastrianni would have never signed it.
Mastrianni's Deposition at 40.

Since defendants were not clear, even after Mastrianni raised the issue of
whether the release would apply to his vested benefits, the Separation Agreement
fails the fourth prong of the <u>Laniok</u> test. The Court should therefore hold that an
issue of fact exists whether Mastrianni knowingly and voluntarily gave up his right
to disability benefits even though the release did not explicitly so state. Defendants'
motion for summary judgment should therefore be denied.

IV.    CONCLUSION

For the reasons stated above, defendants' motion for summary judgment
should be denied since material questions of dispute fact exist whether the
Separation Agreement applies to Mastrianni's vested disability benefits and whether

it was sufficiently clear that Mastrianni knowingly and voluntarily waived his right

to continue receiving benefits.

PLAINTIFF,
DAVID MASTRIANNI

By_____
David S. Rintoul (ct#08456)
BROWN, PAINDIRIS & SCOTT
2252 Main Street
Glastonbury, CT 06033
Ph (860) 659-0700
Fax (860) 659-8292

## CERTIFICATION

The undersigned certifies that a copy of the foregoing was sent April 7, 2005, first-class mail, postage prepaid, to:

William J. Albinger, Esq.
Wiggin & Dana
One Century Tower
265 Church Street, P.O. Box 1832
New Haven, CT 06508-1832

_____
David S. Rintoul

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID MASTRIANNI | : | CIVIL ACTION NO: |
| v. | : | 3:02 CV 22611(CFD) |
| | : | |
| | : | |
| BAYER CORPORATION; and BAYER | : | |
| CORPORATION DISABILITY PLANS | : | |
| Defendants. | : | |

**AFFIDAVIT**

COUNTY OF *Litchfield* )
               ) ss. *Wolcott*
STATE OF CONNECTICUT )

      The undersigned, being over the age of eighteen and understanding the obligations of

an oath, state the following based on his personal knowledge of the facts contained herein.

      1.  I was employed by Bayer Corporation as a Human Resources Representative,

primarily in the area of training employees on the factory floor of the facility in which I

worked and at a computer.

      2.  I starting suffering back pain in 1996, while undergoing chemotherapy and

radiation therapy for treatment of Hodgkin's Lymphoma.

      3.  I developed back trouble, which I believe was caused by or contributed to by my

cancer treatments, though no medical connection has been established.

4. My back condition grew progressively worse, and it began to interfere with my ability to work.

5. I was approved for disability benefits in or about August 2001, which approval was renewed in December 2001, effective through March 17, 2001. During this time, I worked part-time. The Disability Plan paid me disability benefits to make up the difference between my earnings from working part-time and my regular full time wages.

6. In early March 2002, I became unable to perform my job on even a part-time basis.

7. My physicians determined that I was totally disabled.

8. I was certified a totally disabled for the day of March 18, 2002 by CORE, the third party administrator acting on Bayer's behalf in administering its disability plan.

9. On March 19, 2002, I came to work intending to give notice that I was going out on full disability.

10. After I arrived at work, I learned I had been laid off from his job in a reduction in force.

David Mastrianni

Subscribed and sworn before
me this 7 day of April, 2005.

Notary Public / Commissioner of the Superior Court

BEVERLY VALENTI
Notary Public
My Commission Expires
Jul. 31, 2009

2

Mastrianni v. Bayer Corp.

10-15-2004                                                   David Mastrianni

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------

DAVID MASTRIANNI,          )
          Plaintiff,       )
                           )
     vs                    )
                           )
BAYER CORPORATION and      ) 3:02 CV 2261 (CFD)
BAYER CORPORATION          )
DISABILITY PLANS,          )
          Defendants.      )

---------------------------

--------------------------------------------------------
Deposition of: DAVID MASTRIANNI
--------------------------------------------------------

Taken before Tina M. Davis, Stenographer and
Notary Public in and for the State of Connecticut,
pursuant to notice, at the offices
of WIGGIN and DANA, CityPlace I, 185 Asylum Street,
Hartford, Connecticut, on Friday, October 15, 2004
scheduled to commence at approximately 10:00 a.m.

Tina M. Davis
Court Reporter
Brandon Reporting Service
44 Capitol Avenue
Hartford, CT  06106
(860) 549-1850

d6f9b256-0acc-4467-a0a9-d2466272ab3d

Page 28

```
 1        Q.  Okay.  Am I correct that one of your goals in

 2    retaining legal counsel was to get the long-term

 3    disability benefits to which you believe you were

 4    entitled?

 5        A.  Yes.

 6        Q.  Okay.  So it doesn't surprise you that

 7    Attorney Monahan would have written to Bayer about the

 8    issue of your long-term disability benefits, that's what

 9    you hired her to do; is that correct?

10        A.  Correct.

11        Q.  Okay.  Was it your understanding from your

12    discussions with Attorney Monahan that if you signed the

13    separation agreement that had been given to you by Bayer

14    that you would not be able to get the long-term

15    disability benefits you wanted?

16        A.  No.

17        Q.  That was not your understanding?

18        A.  No.

19        Q.  What did Attorney Monahan tell you about the

20    separation agreement and the release?

21            MR. RINTOUL:  I'll allow the questions

22    regarding Ms. Monahan, but generally otherwise reserve

23    the issue of privilege.

24        A.  Well, she had explained that if I signed -- if I

25    signed the release -- she said that there were multiple
```

Case 3:02-cv-02261-CFD    Document 43    Filed 04/08/2005    Page 17 of 23
10-15-2004                    Mastrianni v. Bayer Corp.                    David Mastrianni

Page 29

1    things that she felt that Bayer had done wrong in my

2    release, and by signing this I would be relieving Bayer

3    or I would not be able to file, like, a wrongful

4    discharge lawsuit.  She had mentioned a few other

5    things.  And she said at that time that we shouldn't

6    sign and we weren't going to release them of any of

7    those things.  So that was what my understanding was at

8    that time.

9         There were other people at Bayer that -- besides

10   the wrongful -- that went along with the wrongful

11   discharge that may have been pursued at that time, also,

12   people that basically -- I don't know if you want to say

13   didn't like me or were looking to have me terminated.

14              MR. HARRIS:   (Addressing the Court Reporter)

15   Can I have that last response read back, please?

16

17              (The previous question and answer

18               was repeated by the court reporter.)

19

20   BY MR. HARRIS:

21     Q.   So if I understand your testimony correctly, your

22   recollection as you sit here today is that the big

23   concern in your discussions with Attorney Monahan was

24   that in signing the release you would give up the

25   ability to make a wrongful discharge claim; is that a

d6f9b256-0acc-4467-a0a9-d2466272ab3d

Case 3:02-cv-02261-CFD    Document 43 Bayer Corp.    Filed 04/08/2005    Page 18 of 23
10-15-2004                                                        David Mastrianni

Page 39

1       guess, to obtain benefits.

2           Q.   So if I understand you correctly -- and let me

3       assure you when I do this I'm not trying to put words in

4       your mouth.  I'm simply trying to make sure that I

5       understand your testimony.  So if I'm not characterizing

6       your testimony correctly, please let me know.

7               If I understand you correctly, it's your

8       testimony that your understanding at the time was that

9       the separation agreement would not preclude you from

10      making a claim for disability benefits as it was

11      written, you simply wanted this additional language in

12      there to explicitly state that you could make the

13      claim?

14          A.   Correct.

15          Q.   So there was no question in your mind that --

16      withdraw that.

17              If it was your understanding that there was

18      nothing in the separation agreement and release that

19      might preclude a claim for disability benefits, why go

20      to the trouble of having a lawyer get this clarification

21      if it was so clear?

22                  MR. RINTOUL:  Objection.  You can answer.

23          A.   Could you repeat that question again?

24                  MR. HARRIS:  (Addressing the Court Reporter)

25      Please read it back.

10-15-2004                                                David Mastrianni

Page 40

     1                    (The previous question was

     2                repeated by the court reporter.)

     3

     4                MR. RINTOUL:  And the objection stands.

     5        A.  Well, it wasn't clear.  If I could have got the

     6    benefit on my own, I wouldn't have seeked (sic) counsel.

     7    BY MR. HARRIS:

     8        Q.  So you understood that if you signed the

     9    agreement as it was written that there was some risk

    10    that you would not be able to get long-term disability

    11    benefits?

    12        A.  No.  I understood that if I had signed -- at the

    13    time I didn't want to sign anything, because I wasn't

    14    sure of what I was signing.

    15        Q.  Okay.

    16        A.  And in no way was I going to waive my right to

    17  . disability.

    18        Q.  So you weren't sure whether you would be waiving

    19    your right to disability benefits or not --

    20        A.  Correct.

    21        Q.  -- if you signed this agreement?

    22        A.  Correct.

    23        Q.  You understood, however, that if you signed the

    24    agreement you would be giving up your right to bring,

    25    for example, a wrongful discharge claim?

d6f9b256-0acc-4467-a0a9-d2466272ab3d

Page 42

1       Q.   Okay.  Have you ever seen this letter before?

2       A.   I would have to say no, but I could be wrong.

3       Q.   Okay.  Well, certainly even if you never saw the

4    actual letter, you understood from your counsel that

5    Bayer responded to his letter dated May 17, 2002 by

6    saying that they would not change the release; you

7    understood that?

8              MR. RINTOUL:  I'll permit the question but

9    otherwise reserve privilege issues.

10   BY MR. HARRIS:

11      Q.   Do you understand the question?

12      A.   Can you repeat that again?  Sorry.

13

14              (The previous question was

15              repeated by the court reporter.)

16

17      A.   Correct.

18   BY MR. HARRIS:

19      Q.   Okay.  And you understood that in Bayer refusing

20   to modify the language of this release that Bayer was

21   indicating that you would not be able to make a claim

22   for disability benefits if you signed the release?

23              MR. RINTOUL:  Objection.  You can answer.

24      A.   I hate to do this to you.  One more time.

25

Page 43

```
1                    (The previous question was

2                    repeated by the court reporter.)

3

4        A.  No.  My understanding -- like I had said, my

5    understanding was that the language to clarify it would

6    have made going after benefits easier, that Bayer was

7    basically going to let me go after my long-term

8    disability benefits.  By not changing the wording, I

9    just felt that we had to pursue it in more depth.

10   BY MR. HARRIS:

11       Q.  What did you need to pursue in more depth with

12   Bayer with their refusal to modify the language of the

13   release?

14       A.  Well, I didn't say with Bayer.  I just said that

15   we needed to pursue obtaining long-term disability.

16       Q.  It was important to you to be able to collect the

17   long-term disability benefit, wasn't it?

18       A.  Obviously, yes.

19       Q.  So wasn't it a source of concern for you when

20   Bayer responded to Attorney Rintoul saying that they

21   would not agree to that modification that would make it

22   clear that claims for long-term disability were not

23   covered by the release?

24       A.  I don't think I understand the question.

25       Q.  Well, you've indicated that it was obviously very
```

Page 44

1      important for you to be able to collect long-term

2      disability benefits.

3          A.   Correct.

4          Q.   And your attorney on your behalf wrote to

5      Bayer -- let me withdraw that.

6              As we've seen in Exhibit 4, the letter from

7      Attorney Monahan that she wrote to Bayer on your behalf

8      concerning the issue of whether or not you would be able

9      to collect long-term disability benefits; correct?

10         A.   Yes, we saw that letter.

11         Q.   And then we saw in Exhibit 5 that

12     Attorney Rintoul on May 17th wrote to Bayer seeking

13     clarification that you would be able to collect

14     long-term disability benefits; correct?

15         A.   Correct.

16         Q.   And the clarification that Attorney Rintoul

17     sought on your behalf was a modification to the release

18     that would make clear that long-term disability benefits

19     weren't covered; correct?

20         A.   I believe so, yes.

21         Q.   And you said that you understood that Bayer's

22     response was that they would not make that change;

23     correct?

24         A.   Yeah.   Their response was they had standard

25     language and they weren't changing it, I believe.

d6f9b256-0acc-4467-a0a9-d2466272ab3d

1        Q.   They said that they would not give you the

2    clarification that you were looking for that would make

3    clear that long-term disability benefits were not

4    covered by the release; correct?

5        A.   Correct.

6        Q.   So wasn't that a source of concern for you, given

7    how important those benefits were?

8        A.   Yes.

9        Q.   Was part of your concern -- withdraw that.

10        Part of your concern was that Bayer, in view of

11   their refusal, might take the position that any claim

12   for long-term disability was in, fact, barred by the

13   release?

14        A.   That wasn't my understanding at the time.

15        Q.   That never crossed your mind?

16        A.   Well, the whole thing crossed my mind.  I mean,

17   it was -- we were looking for clarification, but I was

18   of the opinion that the benefit carrier and the company

19   are two different entities or -- so I wasn't releasing

20   insurance.  I was releasing Bayer.

21        Q.   But you also understood that the insurance

22   company could provide you with long-term disability

23   benefits only if you were, in fact, covered by the plan;

24   correct?

25        A.   Well, like I said, I was already under short-term